# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re<br><br>JOHN J. KEEFE, III,<br><br>                          Debtor<br><br>_____<br><br>DONALD R. LASSMAN, as he is<br>   CHAPTER 7 TRUSTEE,<br><br>                          Plaintiff<br><br>v.<br><br>JOHN J. KEEFE, III,<br><br>                          Defendant | Chapter 7<br>Case No. 05-11781-RS<br><br><br><br><br><br><br><br><br>Adversary Proceeding<br>No. 06-1198 |

## MEMORANDUM OF DECISION

By his complaint in this adversary proceeding, Donald R. Lassman, as he is Chapter 7 trustee in this bankruptcy case, objects to the discharge of the defendant and debtor, John J. Keefe, III, under 11 U.S.C. § 727(a)(3) on the basis that he destroyed certain documents and records from which his financial condition or business transactions might be ascertained. The matter having been duly tried and briefed, the Court now enters the following findings of fact and rulings of law. For the reasons set forth below, the debtor shall be denied a discharge.

## FACTS AND PROCEDURAL HISTORY

The debtor, John J. Keefe III, is a carpenter and homebuilding contractor. In or around 1997, after working for his father's contracting business for some years, he went into business for himself by incorporating, KRK Development, Inc. ("KRK"), of which he was, at all relevant times, the sole shareholder, officer, and director. By 2004, KRK had approximately eight

employees and was handling 12 to 15 large projects simultaneously, each involving contracts for several hundreds of thousands of dollars. Keefe oversaw the entire enterprise but brought little business sense or record keeping ability to the task   Except for a period of one or two years (2001 to 2002) in which Keefe hired a payroll assistant to oversee KRK's payroll—she kept track of employee hours, wrote payroll checks, and kept some payroll records—the corporation had no record keeper other than Keefe himself. For the most part, he kept the corporation's records in a large plastic bin. The bin included the corporation's bank records, consisting of monthly statements and cancelled checks from three or four banks, with each bank's records in a shoe box of its own. One of these accounts was in the name of Keefe himself, doing business in the name of the corporation, but I have no evidence as to which account that was and which time period it related to. The bin also included file folders for each of the projects on which KRK was working. Each folder included the contract for the project and various receipts and other documents related to the project. Aside from the ledgers for KRK's various checking accounts, Keefe did not maintain a cash flow ledger for KRK.   The bin was kept in KRK's office, which, after two previous locations, was located in Keefe's own home in 2004 and the early months of 2005.

  In the spring of 2004, KRK began experiencing cash flow problems that arose from non-payment by a client who owed a substantial sum, from underbidding on other projects, and from Keefe's inability to serve as foreman on the many jobs that KRK was handling at once—the employees he hired to do the job in his stead did not have his talent for cost containment. The crisis only snowballed. KRK was unable to complete certain of its projects and, in essence, had to walk away from them. In one instance, it abandoned a project on which it had received a $100,000 advance for work that KRK had not completed.

2

In August of 2004, Keefe consulted a bankruptcy attorney about his problems. By the winter of 2004-2005, Keefe had become seriously depressed about KRK's financial troubles. His clients had begun to harass him—some had hired a sheriff to serve IRS Forms 1099 on him on Christmas eve in 2004. He was physically threatened on more than one occasion. Some clients circulated a slanderous letter about him to suppliers, subcontractors, and inspectors with whom he regularly did business. The mere sight of the plastic bin containing the business's financial records would make him ill. Sometime between December 2004 and February 2005, he relieved himself of this immediate problem by driving the bin to, and depositing it in, a dumpster belonging to a roofing contractor friend. He thus essentially destroyed the records contained in the bin.

Not all the corporation's records were destroyed. He retained a disc or zip drive containing the payroll records maintained by the payroll assistant he'd employed in 2001 and 2002. He also had retained the file relating to the project on which the client had defaulted, a receivable he estimated at $200,000.

The trustee implies that Keefe discarded the bin of records with intent to hinder, delay, or defraud his creditors and possibly the trustee himself. I find no evidence to support this. There is no evidence that he destroyed the records or dealt with his clients with intent to hinder, delay, or defraud. The evidence suggests that he simply had gotten in over his head. Seeing no way out, he finally buckled under the pressure by destroying the records, which, as a human reaction (though not a business practice) is understandable enough.

On March 11, 2005, Keefe filed a petition for relief under Chapter 7 of the Bankruptcy Code. In his schedules he listed unsecured debts totaling approximately $1,000,000, consisting mostly of obligations to clients, suppliers, and subcontractors of the construction business. It is

3

not clear whether these obligations are truly his own or those of KRK.

Donald Lassman was appointed chapter 7 trustee in Keefe's bankruptcy case. Keefe disclosed to Lassman that he had discarded the records in the plastic bin. Lassman asked Keefe to produce certain records. Keefe did produce records of certain real estate transactions from sale of his home and of another home that his wife had owned before they married. Keefe also told Lassman that he had made inquiry at the banks with whom he had done business about obtaining copies of the records that he had discarded, and that the banks had told him he would have to pay for retrieval of the records, and that cost might be substantial, more than Keefe could afford. Lassman asked Keefe to inquire into the cost. Keefe apparently made initial inquiries but met with resistance and then didn't follow up and also didn't keep Lassman informed of his progress. However, close to the time of trial (held May 2, 2007), Keefe finally succeeded in obtaining records from one of the three banks. Inexplicably, neither the debtor nor the trustee moved to subpoena the records from the banks under Rule 2004.

The discarded bank records could have been recovered by subpoenaing the records in question from the various banks. The discarded project records could not have been so easily reconstructed. Some of these documents could have been obtained by subpoenaing records from clients, suppliers, inspectors, and subcontractors, but, in view of the number and nature of the sources, the cost, time, and logistical difficulties would be prohibitive, especially where the estate had no funds with which to proceed and Keefe himself had little money to pay the banks' retrieval fees. The discarded records also included Keefe's notations on the records; these notations are lost forever.[1]

---

[1] Keefe testified whenever he received a payment from a client, he would make a notation to that effect on the client's contract. Aside from check registers, I have no evidence of other self-generated records.

**DISCUSSION**

Section 727(a)(3) states that

> (a) The court shall grant the debtor a discharge, unless–
>
> > (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The initial burden is on the party objecting to discharge to prove two things: (i) that the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information"; and (ii) that the recorded information was information "from which the debtor's financial condition or business transactions might be ascertained." The plaintiff need not establish specific intent of any kind. If the party objecting to discharge proves these two requirements, the burden then shifts to the debtor to prove that "such act or failure to act was justified under all of the circumstances of the case." *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (BAP 1st Cir. 2000) (debtor must come forward with justification).

The act on which the trustee is proceeding against the debtor is solely his destruction of records by discarding of the bin of bank records and project folders. The trustee has also adduced evidence that the debtor failed to keep—"keep" here meaning generate, not retain—records of the business activities of his contracting business. However it is clear from his complaint and his pretrial statement that the gravamen of the complaint is that "he destroyed relevant financial records." Joint Pretrial Statement, p. 7 (statement summarizing the plaintiff's case); Complaint, ¶ 13. The debtor admits that he destroyed the records contained in the plastic storage bin. The plaintiff's first element is therefore established.

5

The plaintiff must next establish that the recorded information that was destroyed was information "from which the debtor's financial condition or business transactions might be ascertained." The records contained in the bin were, for the most part, records of KRK, a corporation separate and distinct from Keefe; they are not *per se* information from which *the debtor's* financial condition or business transactions might be ascertained.

However, the debtor listed a number of KRK's clients, suppliers, and subcontractors as creditors in his schedules, including three clients with claims of $150,000 or more. At least one client has filed a proof of claim in this case. It has not been established that the claim of this client, or the claims of the listed clients, suppliers, and subcontractors, are valid claims against the debtor (as opposed to KRK). Nonetheless, the debtor anticipated that these entities might assert claims against him personally, and the project files would clearly be relevant to determining the validity of these claims as against him.

I also note that the discarded bin included the records of one bank account that the debtor testified he had maintained in his own name (albeit d/b/a KRK). I surmise that the activity in that account was, by virtue of the fact that the records were contained in the bin, activity relating almost entirely to the contracting business of KRK. Nonetheless, where the account was in Keefe's own name, it would on its face be relevant to determining Keefe's own financial condition and business transactions. However, the bin apparently included records going back many years, and Lassman has not established that the account in question pertained to the two years immediately preceding the bankruptcy filing, when KRK's troubles began. As to this account, therefore, I find that relevance has not been established.

The trustee has established that the debtor destroyed project records and that these were records from which the debtor's financial condition or business transactions might have been

6

ascertained.  The burden now shifts to the debtor to prove that the destruction of these records "was justified under all of the circumstances of the case."  Keefe's effort at justification includes four components:  (i) he did not destroy the records with intent to hinder, delay, or defraud creditors or the trustee; (ii) in destroying the records, he was simply reacting to the records as the source of his depression and anxiety; (iii) the destroyed records can be recovered by various means; and (iv) he made a good faith attempt to recover the bank records but was stymied by the cost and by the unwillingness of the banks to produce the record except for a fee, and then only at their own pace.

     The debtor has failed to establish that the destruction of the records was justified.  His intent in destroying the records was benign, but the records were destroyed nonetheless, and their destruction has greatly hindered the trustee in ascertaining the debtor's financial condition and financial transactions.  An act is justified if it is right or appropriate in the circumstances.  There is no sense in which the destruction of the project records can be viewed as right, good, or appropriate.  Keefe himself testified that he fully expected to see a number of law suits arising from the projects that KRK had abandoned.  As he was well aware, there remained unresolved legal issues arising from these projects, issues to which the discarded records would be relevant.  The necessity of the records makes their destruction unjustified.

     If the records could be recovered easily and without much cost, perhaps their destruction would be deemed justified in the sense that the destruction was inconsequential.  That is not the case here.  The project records cannot be retrieved except at prohibitive expense.  The destruction

of the records was not inconsequential and was not justified. It follows that the debtor must be denied a discharge. A separate judgment shall enter accordingly.

Date:  December 27, 2007                  /s/ Robert Somma
                                          _____
                                          Robert Somma
                                          United States Bankruptcy Judge